UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

**FILED**

⊔I OCT 16 PM 1:33

U.S. ???????, ?? ?I
N.D. OF ALABAMA

| | | |
|---|---|---|
| ROBERTA NICKAS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-99-S-2674-NE |
| | ) | |
| PEI ACQUISITION CORPORATION, INC., | ) | |
| d/b/a PEI ELECTRONICS, | ) | |
| | ) | |
| **Defendant.** | ) | |

**ENTERED**

OCT 1 6 2001

### MEMORANDUM OPINION

Plaintiff asserts claims under the Americans with Disabilities Act of 1990 for her former

employer's discrimination on the basis of disability and retaliation. The action presently is before

the court on defendant's motion for summary judgment. Upon consideration of the pleadings,

evidentiary submissions, and briefs, this court concludes the motion is due to be granted.

### I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is

proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P.

56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after

adequate time for discovery and upon motion, against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S. Ct.

2548, 2553, 91 L.Ed.2d 265 (1986).



> In making this determination, the court must review all evidence and make all
> reasonable inferences in favor of the party opposing summary judgment.
>
>    The mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is material to an issue affecting the outcome of
> the case. The relevant rules of substantive law dictate the materiality of a disputed
> fact. A genuine issue of material fact does not exist unless there is sufficient
> evidence favoring the nonmoving party for a reasonable jury to return a verdict in its
> favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City*

*of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real*

*Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

## II. FACTS

Defendant, PEI Electronics, Inc. ("PEI"), manufactures electronic components, principally

for the United States government, and employs approximately 400 people. Plaintiff, Roberta Nickas,

began her employment with PEI on February 24, 1997, in the capacity of a "Tech III Assembler."

The job description for that position reads as follows:

> Assembles, disassembles and modifies circuit card assemblies, cables, mechanical,
> electronic, microelectronic, electro-optical assemblies, and higher assemblies and
> subassemblies from operation instruction sheets, blue prints, process sheets, samples,
> assembly drawings, and wiring diagrams and schematics. Makes minor machine and
> equipment set-ups and adjustments pertaining to assembly. Operates departmental
> machines and equipment as required. Prepares components and other materials for
> assembly. Performs rework, reprocessing or replacement of nonconforming parts or
> materials to make them conform to drawings, specifications, and/or contracts on all
> assemblies and subassemblies. **Uses** jigs, fixtures, **soldering irons** and other hand
> and power tools.[1]

Tech III Assemblers principally worked in three areas of PEI's plant, which the parties have

referred to as the "printed circuit board area," the "tool crib," or the "display room."[2] In early 1998,

---

[1] Plaintiff's Brief in Opposition at 2 (emphasis supplied).

[2] *See, e.g.*, plaintiff's brief in opposition to defendant's motion for summary judgment (doc. no. 39), at 3 n.2.

plaintiff was transferred from the printed circuit board area to the display room[3] — which she

described as "the enclosed room,"[4] because its doors always were closed.  Plaintiff's choice of

adjective also may have had a spatial basis:  fifteen Assemblers worked in a forty by thirty foot

space, assembling electronic components on eight rows of work benches.[5]  Each bench was equipped

with a vent,[6] to vacuum fumes emitted when soldering, but the vents could be switched off by

employees.[7]  Assemblers were encouraged, but not required, to use the vents.[8]  In fact, most did not.[9]

PEI did not provide fans, but some employees, like plaintiff, purchased personal, three-inch fans to

cool their individual work spaces.[10]

　　　　The Assemblers working in the display room were supervised by Hank Fincher, a production

supervisor.[11]  Fincher reported to Weldon Plant, PEI's manufacturing operations manager.[12]  Plant

reported to Richard Kreitz, the vice president of operations.[13]

　　　　Plaintiff began experiencing respiratory problems shortly after her transfer to the display

room.[14]  She complained of "[d]ifficult[y] breathing, wheezing, [and] severe bronchitis."[15]  When

she first complained to Hank Fincher about such problems, "he didn't take it serious[ly]."[16]  She

---

[3]Plaintiff's evidentiary submission, Tab A (Nickas deposition), at 55.

[4]*Id.* at 42.

[5]*Id.* at 40.

[6]*Id.* at 49.

[7]*Id.* at 50.

[8]*Id.*, Tab G (Bennett deposition), at 69.

[9]*Id.*, Tab A (Nickas deposition), at 46.

[10]*Id.*, Tab H (Fincher deposition), at 51-52.

[11]*Id.*, Tab A (Nickas deposition), at 40; Tab H (Fincher deposition), at 8, 16-17.

[12]*Id.*, Tab A (Nickas deposition), at 58-59; Tab D (Plant deposition), at 5; Tab H (Fincher deposition), at 9.

[13]*Id.*, Tab D (Plant deposition), at 8.

[14]*Id.*, Tab A (Nickas deposition), at 42-43.

[15]*Id.* at 23.

[16]*Id.* at 43.

complained again, but Fincher merely suggested that she use the bench vent.  Plaintiff was

handicapped in the use of her vent, however, because other Assemblers working at the same bench

complained about it being noisy and distracting.  Whenever plaintiff switched-on the bench vent or

her personal fan, she "would be cursed" and "called terrible names."[17]  One co-employee in

particular, Melissa Fletcher, "harassed" plaintiff for using either appliance.[18]  Fletcher became "very

ugly" and spoke to plaintiff "in a threatening tone,"[19] saying that she "better *not* turn that fan on,"

because it "bugg[ed]" her, and made her cold.[20]  Fletcher also complained to Fincher, saying, "You

[sic] going to have to do something about her, point[ing] to [plaintiff].  Get her out of here.  Do

something with her.  I can't put up with her fan and I can't put up with her vent.  She shouldn't be

in this room."[21]

Plaintiff first received medical treatment for breathing difficulties on March 31, 1998.  She

had made an appointment for examination by her family physician, Dr. Carol Motley of the Primary

Care Medical Center, but Dr. Motley was out of the office when plaintiff arrived, and she was

examined by another physician associated with the clinic, Dr. Mary Toland,[22] who recalled that

plaintiff complained of "coughing and chest congestion and heavy feeling in her chest."[23]  She

diagnosed plaintiff's condition as bronchitis and asthma, and prescribed an inhaler.[24]

Plaintiff's condition did not improve, however, and she was again seen by Dr. Toland three

---

[17]*Id.* at 57.

[18]*Id.* at 44.

[19]*Id.* at 47.

[20]*Id.* at 47-49.

[21]*Id.* at 49-50.

[22]Defendant's evidentiary submission (doc. no. 31), Tab 9 (Toland deposition), at 18-19.

[23]*Id.* at 19.

[24]*Id.* at 21-22.

days later, on April 2, 1998.  Plaintiff continued to complain of difficulty breathing, a low

temperature, and chills.  Toland prescribed more aggressive treatment and medication, including

Albuterol and Prednisone.  A few days after Toland's second examination, plaintiff told Hank

Fincher that she had been

> diagnosed with asthma, which explains why I was having trouble breathing and I
> need to be in an open area because I breath better in an open area.  And I would like
> to be transferred out of this closed-in room to an open area.  Anywhere else you put
> me as long as it's open, I don't have the problems breathing as I do in this room.[25]

Fincher responded, "I'll have to check on it.  I'll have to see what I can do."[26]

A few days later, after Fincher had done nothing, plaintiff again asked to be transferred.  She

requested reassignment to the printed circuit board area, the cable shop, or the parts crib.  Fincher

replied, "I'm afraid I can't let you do that.  ...  You're just going to have to do the best you can do

in this room."[27]

Plaintiff complained to Fincher numerous times during the following months.  On one

occasion, she said, "I'm getting worse.  I cannot breathe good.  I cannot use my vent or my fan.

What am I going to do?"  Fincher merely replied, "I'll see to it."[28]

Plaintiff also complained to Weldon Plant, the manufacturing operations manager.  About

two weeks after Dr. Toland's second examination, plaintiff met Plant in the hallway.  She was

"having trouble breathing and ... was upset."  According to Nickas, Plant saw her, and "asked ...

what was wrong with me."[29]

---

[25]Plaintiff's evidentiary submission, Tab A (Nickas deposition), at 53.

[26]*Id.* at 54.

[27]*Id.* at 54, 55.

[28]*Id.* at 56-58.

[29]*Id.* at 60.

Q.     And what did you tell him?

A.     I told him I'm having severe problems breathing.

Q.     And what did he say?

A.     Something to the effect of we don't have a nurse here. You can get someone
       to take you to the doctor or something to that effect.

Q.     Did you tell him that something about your work area was causing you to
       have trouble breathing?

A.     Yes. Yes, I did. I told him I'm having very much difficulty breathing in that
       room. And I have asked to be taken out of that room.

Q.     And what did he say?

A.     And can you help me to be taken out of the room. I'll see what I can do. He
       could never do anything.[30]

Plaintiff recalled one other occasion on which she approached Weldon Plant, and asked why

she could not be moved back to the printed circuit board area.[31] In her words, she was "very upset.

I was in tears, the best I remember, to the point of begging."[32]

Q.     And what did you say to him and what did he say to you?

A.     I asked him to please get me out of the room.

Q.     And what did he say?

A.     That's up to your supervisor. I have nothing to do with it.[33]

Plaintiff was hospitalized in July of 1998 for asthmatic bronchitis with bronchial infection.[34]

---

[30]*Id.* at 60-61.

[31]*Id.* at 61.

[32]*Id.* at 62.

[33]*Id.*; *see also id.* at 63 ("You have to talk to your supervisor. ... I have nothing to do with that.").

[34]*Id.* at 93-96; *see also* defendant's evidentiary submission, Tab 9 (Toland deposition), Ex. 1.

Before returning to work, she was examined by PEI's company physician, Dr. Daniel Morgan.[35]
During the visit, Dr. Morgan learned that plaintiff was regularly exposed to soldering fumes in the
workplace. He authorized her return to work, but specified that she should have no exposure to
soldering fumes for at least two weeks. He issued a note on his prescription pad, reading: "[Nickas]
needs no fumes exposure [for] (2) weeks, and to be compliant [with] medication as directed by her
personal doctor."[36]

When plaintiff returned to work at the end of July, therefore, she was assigned to the tool
crib.[37] She told the supervisor of the crib that she enjoyed working there, that she was able to breathe
better.[38] Nevertheless, plaintiff was reassigned to the display room at the end of the two-week
period. She claims she immediately began experiencing shortness of breath.[39] Plaintiff again
complained to Fincher, but he responded, "You [sic] just going to have to learn to like it and to live
with it. This is where you are assigned."[40]

## A.    The September 24, 1998 Incident

Plaintiff suffered what she now claims was a severe asthma attack on September 24, 1998.
Early that morning, she had experienced extreme difficulty breathing, and frequently used her
inhaler. At 9:30 a.m., Melissa Fletcher called her an "old white bitch," and told her "to retire and
get the hell out of there."[41] Fletcher and another co-employee, Cynthia Hill, then threatened to "beat

---

[35]Defendant's evidentiary submission, Tab 5 (Morgan affidavit), at 2.

[36]*Id.*, Ex. A.

[37]Plaintiff's evidentiary submission, Tab G (Bennett deposition), at 149-50.

[38]*Id.*, Tab A (Nickas deposition), at 89-90.

[39]*Id.* at 98.

[40]*Id.*

[41] *Id.* at 103.

the hell out of" her.[42]  Plaintiff went to the restroom to wash her face and get "settled down."[43]  On

her way back to the display room, she encountered Hank Fincher and told him of Fletcher and Hill's

conduct.  Fincher reacted with surprise, and said, "Well, you're not supposed to be subjected to that.

I'll go see what I can find out."[44]  Plaintiff attempted to continue working, but became progressively

more ill.  During the lunch hour, while she sat with a friend, Caroline Wilson, plaintiff became sick

to her stomach, started gasping for breath, and felt a pain in her chest.[45]  Wilson realized that plaintiff

needed medical treatment, and walked her to the office of PEI's benefits coordinator, Deidra

Cooley.[46]

Plaintiff sat in a chair in Cooley's office, and said "I'm feeling very sick.  I think I'm going

to pass out."[47]   Cooley asked whether she should call plaintiff's husband or 911 for emergency

assistance.  Plaintiff exclaimed, "My chest hurts, my chest hurts.  I feel like I'm having a heart

attack."[48]  Cooley called out to Jerry Bennett, a safety and security officer in the next office, and told

him to dial 911 for emergency medical assistance.  When Bennett entered the room, plaintiff toppled

out of the chair, onto Cooley's knee.[49]  Plaintiff remembered being on the floor while Bennett talked

by telephone to an emergency dispatch operator.  She recalled, "I felt like [a] table was setting on

my chest."[50]  When paramedics arrived, she was transported by ambulance to Huntsville Hospital.

---

[42]*Id.* at 102-03.

[43]*Id.* at 105-06.

[44]*Id.* at 108.  Plaintiff did not tell Fincher that she was not feeling well, but insists that she did not need to do so, because Fincher "knew.  He saw me use my inhaler in the room.  He knew I couldn't breathe."  *Id.* at 109.

[45]*Id.* at 112.

[46]*Id.*, Tab I (Cooley deposition), at 6.

[47]*Id.*, Tab A (Nickas deposition), at 113.

[48]*Id.*, Tab I (Cooley deposition), at 105.

[49]*Id.* at 104-06.

[50]*Id.*, Tab A (Nickas deposition), at 114.

**B.      PEI's Investigation of Events Leading to the September 24, 1998 Incident**

As plaintiff was being conveyed to the hospital, Deidra Cooley and Jerry Bennett reported to PEI's Human Resources Director, Larry Wright, that a confrontation between plaintiff and other display room employees had preceded plaintiff's presumed heart attack.[51] Weldon Plant confirmed that plaintiff had complained to her supervisor, Hank Fincher, of being threatened by co-employees earlier in the day. That information coincided with a previous complaint by Tammy Wilson, another Assembler working in the display room, who had told Wright that some co-employees were "doing mean things to her [Wilson],"[52] and used offensive language.

Wright initiated an investigation. He first interviewed plaintiff's lunch-hour friend, Caroline Wilson, who told him that plaintiff had experienced chest pains two days before, following a previous confrontation with Melissa Fletcher.[53] Wilson said that plaintiff had talked about another incident that occurred outside the display room, while she was talking to Kim Leslie. Fletcher approached, said that she had "read" plaintiff's lips through the glass window, and that there "would be hell to pay" if plaintiff was talking about her.[54] (Kim Leslie, who did not work in the display room, confirmed Wilson's hearsay account of this incident, saying that Fletcher had "jumped all over" plaintiff.[55]) Wilson added that plaintiff had been shoved a few days before that incident,[56] and concluded: "the Display Area is not a place employees want to work because of tensions in there."[57]

Wright next interviewed Melissa Fletcher, who appeared "defensive," denied threatening

---

[51]*Id.,*Tab I (Cooley deposition), at 120-21; Tab E (Wright deposition), at 68.

[52]*Id.*, Tab E (Wright deposition), at 99-100.

[53]*Id.* at 70.

[54]*Id.* at 85.

[55]*Id.* at 336-37.

[56]*Id.* at 91.

[57]*Id.* at 86.

plaintiff, and insisted that plaintiff was not "carrying [her] share of the load in the Display Room."[58]

He also interviewed Cynthia Hill, who (like Fletcher) allegedly had threatened plaintiff. She denied doing so, but was "[v]ery talkative about R. Nickas being the problem."[59]

Jeanette Ott — an Assembler not implicated in the display room conflicts — told Wright that she believed the working environment in that area of the plant would be more harmonious if plaintiff and Tammy Wilson were transferred.[60]

Penny Dudley, described as a "fairly low key and quiet" person, confirmed the existence of "personal differences" among display room employees, and added that she would prefer to work in the cable shop.[61]

Lisa Gaines believed that the supervisor, Hank Fincher, did not get proper respect from some employees. She also had witnessed Cynthia Hill call plaintiff "frog eyes," and say "I hope your eyes pop out."[62] She believed Hill and Melissa Fletcher should be separated.

Finally, Wright interviewed Bennie Duskin and Kim Chau, but they had little to say about conflicts in the display room.

Wright concluded that there were three factions in the display room.[63] Melissa Fletcher, Cynthia Hill, and another Assembler composed one faction. They threatened plaintiff and Tammy Wilson, who composed the second faction, because they were "slackers."[64] The final, and largest faction included those employees who quietly performed their job duties. Fletcher's group offended

---

[58]*Id.* at 95.

[59]*Id.* at 311.

[60]*Id.* at 323.

[61]*Id.* at 329.

[62]*Id.* at 333.

[63]*Id.* at 99.

[64]*Id.* at 104-05.

10

them by using offensive language.[65]  Wright recorded five conclusions in his investigative notes:

1.  The supervisor doesn't demand/get respect.
2.  Hill/Fletcher need [to be] separated.
3.  Wilson [should be moved] out of area, [or] fired if [she] can't do [the] job.
4.  Nickas [should be] moved/fired.
5.  Nickas told Hank [Fincher] about hell to pay on Thursday [i.e., September 24th].[66]

Wright later explained his reasons for concluding that plaintiff should either be transferred to another area of the plant or fired as follows:

> Her name came up in just about all of these briefs from the different people that I talked to in the Department.  She was a consistent player as being part of the problem.  I did not know that prior to these interviews.  ...  [H]er name came up disproportionately to other people.  Her and Tammy Wilson were the two key problems.[67]

On Monday, September 28, 1998, while plaintiff was still absent from work, Wright met with all employees who worked in the display room.  He told them that personal differences must be set aside, that all employees had the right to a non-hostile work environment, and that threats would not be tolerated.[68]

The following day, September 29, 1998, plaintiff's husband visited the PEI plant and spoke with Wright.  Mr. Nickas told Wright that some employees in the display room had threatened his wife, saying to her, "I'll kick your ass."[69]  Wright assured him that those issues would be addressed when his wife returned to work.[70]  Mr. Nickas accused PEI of ignoring the problem, and "made some

---

[65]*Id.* at 99.

[66]*Id.* at 312-13.

[67]*Id.* at 357.

[68]*Id.* at 349.

[69]*Id.* at 335-36.

[70]Defendant's evidentiary submission, Tab 1 (Wright affidavit), at 3-4.

11

statement that implied he may have suggested his wife carry a gun."[71]  Wright responded, "Guns are

definitely forbidden on PEI property."[72]  Mr. Nickas then "tried to back out of the remark by saying

he was a big gun supporter."[73]

### C.    Plaintiff's Medical Treatment for the September 24th Incident

When plaintiff was admitted to Huntsville Hospital on September 24th, her medical history

was obtained and a physical examination performed by Dr. Michael L. Ridner, a cardiologist

practicing medicine at "The Heart Center, P.C." He recorded the following information:

> HISTORY OF PRESENT ILLNESS: This is a 50-year-old white female with no
> known prior history of coronary artery disease. *The patient complains of a four day
> history of intermittent chest discomfort*, described as dull ache over the left anterior
> chest with associated dyspnea, occurring mostly with "stress." *The patient is vague
> on when this occurs*; however, *today she had a severe episode of chest discomfort*
> described as a grabbing, crushing sensation of the left anterior chest with definite
> radiation to the left jaw and left arm, that was associated with dyspnea, disphoresis,
> and nausea *after "getting upset."* Afterward evidently she states she had syncopal
> episodes, states she fell out of her chair, had loss of consciousness, and came to in
> a few seconds.  She denies any seizure activity, any urinary or fecal incontinence.
> She was therefore transported by HEMSI [ambulance] to this facility for further
> cardiac evaluation.
>
> ALLERGIES: Sulfa.
>
> CURRENT MEDICATIONS:  Amaril 2.5 mg Q day; Synthroid 0.175 mg Q day;
> Premarin 0.625 Q day; Singulair one Q day; Combivent; Zantac 150 Q day; Diavan
> HCT 160, one Q day.
>
> PAST MEDICAL HISTORY: Hypertension for the last 2 - 3 years; diabetes mellitus
> diagnosed approximately two weeks ago.  Denies history of rheumatic fever or
> cerebrovascular accident. *She has been diagnosed with asthma approximately six
> months ago.*  She denies any kidney or colon problems.  She does have a history of
> hiatal hernia.  Denies any history of peptic ulcer disease.  She has a history of
> hyperlipidemia and was on medication for awhile, but has been noncompliant for the

---

[71]Plaintiff's evidentiary submission, Tab E (Wright deposition), at 362.

[72]*Id.*

[73]*Id.* at 363.

12

last few months.  She denies history of anemia.  She has hyperthyroidism.[74]

The emphasized portion of the immediately preceding paragraph records that plaintiff disclosed she "had been diagnosed with asthma."  Significantly, however, she failed to link that respiratory condition to the "four day history of intermittent chest discomfort" she had experienced prior to admission.  Dr. Ridner testified that:

> Ms. Nickas' complaints during the period when I treated her focused on her chest discomfort.  *At no time during my evaluation and treatment of Ms. Nickas did she make any specific complaints related to her asthma.  Ms. Nickas did not discuss the nature of her employment and did not request any occupation restrictions upon her employment related to an asthmatic condition.*  Ms. Nickas did report shortness of breath with minimal physical exertion.  Lacking any information from Ms. Nickas to the contrary, I attributed this reported shortness of breath to her multiple health conditions, obese stature and lack of an effective exercise program.[75]

Plaintiff underwent cardiac catheterization the following day.  There was no evidence of coronary disease.[76]  Dr. Ridner consequently advised plaintiff "to follow-up with Dr. Carol Motley, her primary care physician, for evaluation of gastrointestinal problems which may have been the cause of her chest discomfort."[77]  Dr. Ridner conveyed that conclusion in a letter to Dr. Motley stating that:

> Ms. Mary Nickas was admitted to Huntsville Hospital this past week with chest discomfort.  Because of her multiple cardiac risk factors, we elected to proceed with further evaluation using cardiac catheterization.  Fortunately, this revealed no evidence of significant coronary disease and her left ventricular function was normal.  On the basis of this, we felt that her chest discomfort had a non-cardiac origin, most likely gastrointestinal.
>
> Her laboratory studies during this hospital stay were notable for a glucose of 194 and I do understand that you have started her on therapy for diabetes mellitus.  In

---

[74]Defendant's evidentiary submission, Tab 10 (Ridner affidavit), at ¶ 9 & Ex. G (emphasis supplied).

[75]*Id.* ¶ 9 (emphasis supplied).

[76]*Id.* ¶ 3.

[77]*Id.*

13

addition, her triglycerides were noted to be elevated at 1,081, with a cholesterol of 216. I reassured her that control of the diabetes may control this problem, as well as efforts at reducing her weight.

*I have asked Ms. Nickas to follow up with you regarding additional evaluation for investigation of a gastrointestinal origin for her symptoms. We did not perform any GI studies during her hospital stay.*[78]

Plaintiff nevertheless returned to The Heart Center for an unscheduled visit on September 30, 1998, complaining of right leg pain. She was examined by Drs. Thomas W. Wright and Carl J. Gessler. An ultrasound of her right groin revealed a small blood clot, probably a result of the catheterization.[79]

Plaintiff again made an unscheduled visit to The Heart Center on October 8, 1998, complaining of continued pain in her right leg. A second ultrasound revealed a small cystic mass. Dr. Ridner referred her to Dr. Ronny Johnson for evaluation of the mass, and "signed family medical leave paperwork for Ms. Nickas to remain off ... work for an additional two week period."[80]

Plaintiff last returned to The Heart Center on November 18, 1998, complaining of continued chest pain. Dr. Ridner reiterated that he "could find no cardiac basis for [plaintiff's] symptoms and referred her back to her primary care physician, Dr. Mary Toland."[81] He also provided plaintiff an authorization to return to work on November 30, 1998,[82] "*with no restrictions.*"[83] Later that same day, Dr. Ridner sent the following letter to Dr. Mary Toland:

I met with Ms. Mary Nickas for an unscheduled visit once again today. We once again went over the fact that her cardiac catheterization was normal and that I found

---

[78]*Id.*, Ex. A (emphasis supplied).

[79]*Id.* ¶ 4 & Exs. B – C ("Ultrasound imaging of her right groin reveals a residual 2.3 cm hematoma.").

[80]*Id.* ¶ 5.

[81]*Id.* ¶ 6.

[82]*Id.* Ex. F.

[83]*Id.* ¶ 8 (emphasis supplied).

14

no cardiac basis for her symptoms.

. . . .

Mary, I regret that I am unable to give you a definite explanation for Ms. Nickas'
atypical chest discomfort.  I do feel we have completely excluded coronary disease
as an etiology.  I think there may be a significant emotional component to what she
is experiencing and it could also be related to her multiple other problems.  I have
encouraged her to follow up carefully with you regarding further studies but, for
now, I would certainly not advocate any additional cardiac testing.[84]

**D.    Dr. Toland's Letter**

On November 12, 1998 — six days prior to plaintiff's last unscheduled visit to The Heart

Center — plaintiff was examined by Dr. Mary Toland.  Plaintiff described the chest pain she had

experienced on September 24th, but did not complain of asthma.[85]  Plaintiff in fact declared that her

asthma "is doing all right now."[86]  Dr. Toland recorded that "[p]atient is in no distress," and that her

asthmatic condition was "under control."[87]

Toward the end of that office visit, however, *plaintiff asked* Dr. Toland to write a letter to PEI

requesting that she be moved to a different area.  Dr. Toland later described that conversation in the

following manner:

I don't remember all of her specific words, but again, this is one of those things that,
you know, as you're getting towards the end of a visit and the patient ... said, ["]*I
know my asthma is doing all right now.*  But I have noticed from the past that when
I'm in the closed-in soldering room I have more problems with my asthma.  It flares
up more.["]  *And she had talked to her boss.  ...  And she had been given the
indication that if I wrote a note for her, explaining how soldering or that the dust and
the fumes can exacerbate asthmatic condition, that they would move her out of that*

---

[84]*Id.*, Ex. E.

[85]Defendant's evidentiary submission, Tab 9 (Toland deposition), at 35, 37.  *See also supra* note 75 and
accompanying text (Dr. Ridner's observations of plaintiff's failure to relate her September 24th chest pains and
symptoms to either her asthmatic condition or work environment).

[86]Defendant's evidentiary submission, Tab 9 (Toland deposition), at 35, 37.

[87]*Id.* at 35.

> area where she was closed in where she could do something else. *So that was what
> she asked me to do.*  And I felt that that was an appropriate thing since she had an
> ongoing asthma or reactive airway condition that was being treated with medication
> every day.[88]

Dr. Toland drafted a letter for plaintiff the following day, November 13, 1998, saying:

> Mary R. Nickas is a patient of mine.  She has asthma and her asthma is frequently
> exacerbated by *dust particles, pollens, etc.  Soldering causes particles to get into the
> air around the person soldering* [and] can cause these types of exacerbations in
> asthmatics.  Mary has had problems with *the soldering dust* bothering her asthma
> *and for this reason I do not feel that soldering is a good job for her.  Please relocate
> her to another position due to this problem.*  Thank you for your attention to this
> matter.[89]

## E.   Plaintiff's Last Physical Examination

Dr. Robert Johnson performed a physical examination of plaintiff at the request of PEI on

the morning of November 25, 1998, to determine her fitness to return to work.[90]  When he asked

plaintiff why she had been on medical leave,

> she stated that she had been admitted to Huntsville Hospital on September 24, 1998
> with complaints of chest pain.  *Ms. Nickas reported that she* [had] *been under the
> care of Dr. Michael L. Ridner of the Heart Center, P.C. following her hospitalization
> for what she described as a "light heart attack."*  Ms. Nickas advised me that Dr.
> Ridner had performed a cardiac catheterization with "good" results and that she had
> been effectively treated for blood clots, *ultimately being released by Dr. Ridner to
> return to work on November 30, 1998 with no restrictions.*
>
> . . . .
>
> At the time of my examination of Ms. Nickas, I was aware that she held the position
> of Tech III with PEI.  *At no time during my examination of Ms. Nickas did she make
> any statements or report any complaints regarding asthma or difficulty breathing.
> Ms. Nickas did not request any occupational restrictions upon her employment
> related to an asthmatic condition adversely affected by any requirements of her
> employment with PEI.*  None of the prescription medications reported to me by Ms.

---

[88]*Id.* at 37-38 (emphasis supplied).

[89]*Id.*, Ex. 2 (emphasis supplied).

[90]*Id.*, Tab 6 (Johnson affidavit) ¶¶ 1 - 3.

Nickas had been prescribed to treat asthma or any form of breathing difficulty.[91] Ms. Nickas did not report that she anticipated any difficulties in performing her job upon her return to work at PEI.[92]

Dr. Johnson performed an EKG, "which was within normal limits," and released plaintiff to return to work, *with no restrictions*, effective November 30, 1998.[93]

**F.     The Effect of Dr. Toland's Letter**

At the conclusion of plaintiff's physical examination by Dr. Johnson on November 25th, she drove directly to the PEI plant and delivered the return-to-work authorizations authored by Drs. Ridner and Johnson to Deidra Cooley, the benefits coordinator. She also met with Larry Wright, the Human Resources Director, to discuss her return to work. It was during this discussion that plaintiff, "for the first time, provided a copy of a work restriction from ... Dr. Mary Toland."[94]

Wright told plaintiff that he would give Toland's letter to Jerry Bennett, Manager of Safety and Security, for review by the PEI Health and Safety Committee. They then engaged in a discussion about employee conflicts in the display room. Wright made notes at the conclusion of his meeting with plaintiff, which he later read into the transcript of his deposition.

> Ms. Nickas said she was counting on me to protect her from, quote, evil people, end quote, in her work area. People she alleges have threatened her at work, and by phone calls to her friends. She said she had consulted a lawyer and she wasn't going to take it anymore. Ms. Nickas also told me she wasn't going to have, quote, a certain supervisor shaking a finger in her face. She continued to stress evil people, in quotes, and was somewhat agitated in her comments.

> Ms. Nickas said she was surprised to see that, quote, a couple of people were

---

[91]*See id.* ¶ 4 ("Ms. Nickas reported that she took five prescription drugs to treat a number of medical conditions to include hypertension and gastrointestinal problems."); *see also id.* Ex. A (listing the following medications reported by plaintiff: Premarin; Synthroid; Zantac; Well-butrin; Diovan HCT).

[92]*Id.* ¶¶ 3, 5 (emphasis supplied).

[93]*Id.* ¶4.

[94]*Id.*, Tab 1 (Wright affidavit) ¶ 9.

still here, end quote, implying she would have expected us to get rid of them.  I explained to her that everyone in the area had been questioned relative to threats and abusive language and that all had been told by me that everyone had to work together in a non-hostile environment.  I assured her that continued incidents would result in disciplinary action.

I told Ms. Nickas to come directly to me at the first and any, underlined, incident of threats or abusive language, and that I, personally, would deal with the problem.  I also told her it would help me if such incidents were witnessed, i.e., for her to stay in the company of others to the extent possible.  She didn't seem comfortable with this aspect of my comments, i.e., the desirability of having a witness.  She said ["]the time I was shoved no one else was around.  They are very careful about that.["]

My overall impression was that Ms. Nickas is angry, underlined, over what she perceives has occurred.  She expected, also underlined, action against certain people, and she expects aggression toward her to continue.  She also appears to have a chip on her shoulder, i.e., not going to take it anymore.  And "not going to take it anymore" is in quotes.[95]

Before delivering Dr. Toland's letter to Jerry Bennett, Wright discussed PEI's obligations under the Americans with Disabilities Act with Traci Cruse, the company's Employment and Compensation Administrator.[96]  He asked what responsibilities the Act imposed on the company. Cruse informed him that PEI had to provide an accommodation if there was an available position that plaintiff was qualified to perform.  Wright showed Dr. Toland's letter to Cruse, and told her that plaintiff was restricted from exposure to soldering fumes, dust particles, and pollens.[97]  Wright then delivered Dr. Toland's letter to Bennett.

That same day, Bennett met with the Health and Safety Committee, to evaluate the impact of Dr. Toland's restrictions upon plaintiff's job assignments.  Keith Martin, the committee chairperson, visited the display room, to determine whether plaintiff could continue working there.

---

[95]Plaintiff's evidentiary submission, Tab E (Wright deposition), at 370-72.

[96]*Id.*, Tab K (Cruse deposition), at 96.

[97]*Id.* at 89-93.

He also conducted a plant-wide "walkthrough," to determine whether plaintiff could work in a different area.[98] Martin actually conducted two "walkthroughs": the first by himself, and the second accompanied by Bennett.[99]  Neither tour was fruitful because, as Martin recalled in deposition, plaintiff was restricted from exposure to substances that were prevalent throughout the plant.[100]

> To the best of my recollection, I remember us looking.  And the first thing we saw was soldering causes particles to get in the air around the person soldering. Those were exacerbating her problems as far as being asthmatic.  So we felt like we had to get her away from any type work like that.  When you looked at it, the other areas were heavily dust laden.  We're talking cribs, material cribs, where cardboard boxes were unpacked, where packing material is at.  Where when you're getting in the boxes unpacking stuff, dust particles are flying all over the place.
>
> I have to be honest, I didn't really understand the issue of pollens, because pollens are all over, every time she goes outside.  We couldn't keep her away from pollens.[101]

Bennett likewise construed Dr. Toland's letter as a permanent restriction on plaintiff's exposure to *any* soldering fumes *or* dust particles.[102]  Comparing Dr. Toland's restrictions to Dr. Morgan's earlier restrictions,[103] Bennett found Dr. Morgan's much more limited: he had restricted plaintiff's exposure to soldering fumes for two weeks only, while Dr. Toland indefinitely restricted plaintiff's exposure to not only soldering operations, but also dust and pollens.[104]

The committee considered all jobs located on the "Military Manufacturing" floor, and determined that all would expose plaintiff to either soldering fumes and/or dust.[105]  The committee

---

[98]Defendant's evidentiary submission, Tab 7 (Martin deposition), at 137-38.

[99]*Id.* at 142.

[100]*Id.* at 134.

[101]*Id.* at 139.

[102]Plaintiff's evidentiary submission, Tab G (Bennett deposition), at 71-72.

[103]*See supra* note 34 and accompanying text.

[104]Plaintiff's evidentiary submission, Tab G (Bennett deposition), at 165-66.

[105]*Id.* at 147.

considered jobs in the "Materials Crib Room," but found dust: "You're unpacking boxes, ripping paper, it's very dusty."[106] Bennett and Martin found that soldering operations were performed in the "Cable Shop" and "PCB Manufacturing."[107] They concluded that plaintiff could not work in the "Shipping and Receiving" department, because dust also was prevalent in that area.[108]

Thus, Martin recalled that when the Health and Safety Committee discussed plaintiff's restrictions,

> [w]e kept coming back to the issues of pollens and dust particles, and no matter where we put her, we wouldn't be able to accommodate those type requests. And finally we said, we just don't know what to do with her. We, as a committee, don't make recommendations any further than that. That's as far as we go.[109]

Bennett communicated the committee's findings to Wright, who testified that Bennett told him the committee had looked in the cable shop, display room, printed circuit board area, shipping and receiving, and the crib areas, but found that all had "one or both of the elements that she had to avoid."[110] Wright believed PEI could have accommodated plaintiff, if her restriction had been limited only to solder fumes, but there was no way to accommodate the "dual prohibition" of solder fumes and dust particles.[111]

When plaintiff reported for work on the morning of November 30, 1998, a security guard told her that Weldon Plant wanted to talk to her in the conference room.[112] When Plant arrived, he and Diane Leslie, a union shop steward, took plaintiff to Larry Wright's office. Wright told her, "We

---

[106]Defendant's evidentiary submission, Tab 7 (Martin deposition), at 146.

[107]*Id.* at 147-48.

[108]*Id.* at 148.

[109]*Id.* at 155-56.

[110]Plaintiff's evidentiary submission, Tab E (Wright deposition), at 53.

[111]*Id.* at 54 (emphasis supplied).

[112]*Id.*, Tab A (Nickas deposition), at 148.

don't feel like we have any position in here that we could put you on," and that she was being laid off indefinitely.[113] When plaintiff asked why she was being laid off, Wright responded that there was no position available for her.[114] Leslie suggested that plaintiff be moved to the tool crib, but Wright said "no."[115] Plaintiff asked him why, and Wright responded "I don't have to give you a why."[116] Wright testified that he told her she could return to her old position, if her condition improved or Dr. Toland's restrictions were removed.[117]

Plaintiff drove to Dr. Toland's office the following day. She was "extremely upset," and told Toland that PEI had interpreted her letter to mean that "any kind of dust or smells or anything like that would bother her and that that is throughout their building and therefore they didn't have any job that she could do."[118] Dr. Toland admitted that defendant could have been "misguided" by the manner in which she had worded the letter.[119] Consequently, she offered to write another, clarifying the restrictions. Plaintiff declined. She that she had talked to the union president, and they were planning to hire an attorney.[120]

Plaintiff commenced this action October 1, 1999.[121] Between October 25, 1999 and February 6, 2000, she was employed by United Circuits, Inc., as an assembler of printed circuit boards. She performed soldering operations in that job, but had been allowed to use a fan.[122]

---

[113]*Id.* at 150-51.

[114]*Id.*, Tab D (Plant deposition), at 238.

[115]*Id.*, Tab A (Nickas deposition), at 150.

[116]*Id.* at 150.

[117]*Id.*, Tab E (Wright deposition), at 55-56.

[118]Defendant's evidentiary submission, Tab 9 (Toland deposition), at 42-43.

[119]*Id.* at 44.

[120]*Id.* at 45-48.

[121]Complaint (doc. no. 1).

[122]Defendant's evidentiary submission, Tab 13 (Nadine Payne affidavit).

### III. DISCUSSION

The Americans with Disabilities Act ("ADA" or "the Act") was enacted by Congress in 1990

for the stated purpose of providing "a clear and comprehensive national mandate for the elimination

of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).[123] To achieve such

purposes, among others, the Act provides that no covered entity,[124] including private employers,[125]

> shall discriminate against *a qualified individual with a disability* because of the
> disability of such individual in regard to job application procedures, the hiring,
> advancement, or discharge of employees, employee compensation, job training, and
> other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a) (emphasis supplied).[126] The phrase "a qualified individual with a disability"

means "an individual with a disability who, with or without reasonable accommodation, can perform

the essential functions of the employment position that such individual holds or desires." *Id.* §

12111(8). In turn, the concept of "disability" is defined three ways — that is, as including any

person: who has a "physical or mental impairment" that "substantially limits" one or more of the

---

[123]When considering the need for such legislation, Congress found that, "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination ... continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Discrimination was found to persist in "critical areas" of everyday life, including "employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." *Id.* § 12101(a)(3). Congress further found that discrimination against persons with disabilities took many forms, ranging from "outright intentional exclusion," to "failure to make modifications to existing facilities and practices." *Id* § 12101(a)(5). Congress concluded that there was a "compelling need" for a "clear and comprehensive national mandate" to eliminate discrimination against disabled persons, and to integrate them "into the economic and social mainstream of American life." S.Rep. No. 101-116, p. 20 (1989); H.R.Rep. No. 101-485, pt.2, p. 50 (1990); U.S.Code Cong. & Admin.News 1990, pt. 2, pp. 303, 332.

[124]42 U.S.C. § 12111(2) provides: "The term 'covered entity' means an employer, employment agency, labor organization, or joint labor-management committee."

[125]42 U.S.C. § 12111(5)(A) provides, in relevant part, that: "The term 'employer' means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person...."

[126]The Act as codified (42 U.S.C. § 12101 *et seq.*) is divided into three principal subchapters, referred to as "titles" in the original legislation. Title I (*id.* §§ 12111 – 12117) addresses discrimination in employment settings. Title II (*id.* §§ 12131 – 12165) covers discrimination in the provision of public services by governmental entities. Title III (*id.* §§ 12181 – 12189) deals with public accommodations and services provided by private entities. Title IV (*id.* §§ 12201 – 12213) addresses so-called "miscellaneous provisions."

"major life activities" of such person; or who has "a record of such an impairment"; or who is "regarded as having such an impairment." 42 U.S.C. § 12102(2)(A) – (C); *see also* 29 C.F.R. § 1630.2(g). "An individual is deemed to be 'disabled' for purposes of the ADA if he satisfies any one of these three enumerated definitions." *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 911 (11th Cir. 1996).

The Act imposes upon employers the duty to provide "reasonable accommodations" for known disabilities, unless doing so would result in undue hardship to the employer. *Id.* § 12112(b)(5)(A).[127]

In addition, the Act contains a provision, similar to that contained in Title VII of the Civil Rights Act of 1964,[128] prohibiting retaliation against persons who exercise rights conferred by the legislation, or who testify or otherwise participate in an investigation or other proceeding under the Act. *See* 42 U.S.C. § 12203(a).[129]

An ADA plaintiff must prove that her employer intentionally discriminated against her

---

[127] 42 U.S.C. § 12112(b)(5)(A) defines the term "discriminate" as including an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant [for employment] or an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; ...."

[128] Section 704(a) of Title VII of the Civil Rights Act of 1964, now codified at 42 U.S.C. § 2000e-3(a), provides protection to those employees who oppose or participate in activities to correct an employer's discriminatory practices:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

[129] 42 U.S.C. § 12203(a) provides:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceedings, or hearing under this chapter.

because of her disability. Where, as here, there is no direct evidence of a discriminatory animus, the "plaintiff may establish a prima facie case of an ADA violation through circumstantial evidence using the familiar burden-shifting analysis employed in Title VII employment discrimination cases." *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001); *see also, e.g., Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999) ("The familiar burden-shifting analysis of Title VII employment discrimination actions is equally applicable to ADA claims.") (citing *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996)); *DeLuca v. Winer Industries, Inc.*, 53 F.3d 793, 797 (7th Cir. 1995) (collecting cases).

To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate: (1) that she has a "disability" within the meaning of the Act; (2) that she is "a qualified individual with a disability," meaning that she could perform the essential functions of the employment position she held or sought, with or without reasonable accommodation being made by the employer;[130] and, (3) that she suffered an adverse employment action because of her disability.[131] *See, e.g., Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000); *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998); *Doe v. Dekalb County School District*, 145 F.3d 1441, 1445, 1454 (11th Cir. 1998); *Stewart v. Happy*

---

[130]*See* 42 U.S.C. § 12111(8) (defining "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"); *see also* 29 C.F.R. § 1630.2(m) ("Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position").

[131]There actually is a fourth element, implicit in the interstice between the second and third: *i.e.*, "a plaintiff must demonstrate that the employer had either actual or constructive knowledge of the disability or considered the employee to be disabled." *Gordon*, 100 F.3d at 910 (citing *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996) (per curiam)).

24

*Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citing *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996)).[132]

## A.   First prima facie element: *is the plaintiff "disabled"?*

As previously noted, the ADA defines the concept of "disability" three ways. Of those, only the first is at issue here: *i.e.*, does plaintiff have a "physical or mental impairment" that "substantially limits" one or more of her "major life activities"?

### 1.   Does plaintiff have a "physical or mental impairment"?

The ADA does not define those conditions constituting a "physical or mental impairment." Instead, that phrase, and many other significant terms in the Act, are only defined in regulations promulgated by the Equal Employment Opportunity Commission pursuant to authority delegated by Congress,[133] and, in the "Interpretive Guidance on Title I of the Americans With Disabilities Act" attached as an appendix to those regulations.[134] Even though such regulations do not bind this court, they may be relied upon "for guidance." *Gordon*, 100 F.3d at 911. The Supreme Court long has recognized that an agency's interpretation of a statute it is charged with enforcing should be given "considerable weight," and should not be disturbed unless it appears from the statute or legislative history that Congress intended a different construction. *Chevron U.S.A., Inc. v. Natural Resources*

---

[132]*See also, e.g., Pritchard v. Southern Company Services*, 92 F.3d 1130, 1132 (11th Cir. 1996) ("In order to establish a prima facie case under the Americans with Disabilities Act of 1990, ... Pritchard must show that: 1) she has a disability, 2) she is a qualified individual, and 3) she was discriminated against because of the disability"). Other courts of appeals have made similar findings. *See, e.g., McKay v. Toyota Motor Manufacturing*, 110 F.3d 369 (6th Cir. 1997) ("A party seeking relief under the ADA for termination must establish (1) that she is a disabled person within the meaning of the Act, (2) that she is qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) that she suffered an adverse employment decision because of her disability"); *Williams v. Channel Master Satellite Systems, Inc.*, 101 F.3d 346, 348 (4th Cir. 1996) ("To establish a cause of action under the ADA, a plaintiff must demonstrate: '(1) that [s]he has a disability; (2) that [s]he is otherwise qualified for the employment or benefit in question; and (3) that [s]he was excluded from the employment or benefit due to discrimination solely on the basis of the disability'").

[133]*See* 42 U.S.C. § 12116 (requiring the EEOC to issue regulations to implement Title I of the ADA).

[134]*See* 29 C.F.R. § 1630.

*Defense Council, Inc.*, 467 U.S. 837, 844, 104 S. Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *see also, e.g., Griggs v. Duke Power Co.*, 401 U.S. 424, 433-34, 91 S. Ct. 849, 854-55, 28 L.Ed.2d 158 (1971) (administrative interpretations "entitled to great deference").

The EEOC's administrative interpretations of the ADA define the phrase "physical or mental impairment" as meaning:

> (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

> (2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h).

Defendant does not deny either that plaintiff has asthma, or that such a respiratory condition is an "impairment" for purposes of the ADA.

## 2.    Does plaintiff's impairment "substantially limit" a "major life activity"?

"A physical impairment, standing alone, ... is not necessarily a disability as contemplated by the ADA.  ...  The ADA requires that the impairment *substantially limit* one or more of the individual's *major life activities*." *Gordon*, 100 F.3d at 911 (emphasis supplied) (citations omitted).

The phrase "substantially limits" is not defined by the Act, but implementing regulations instruct that it means a person either is:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or

> (ii) Significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general

population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).  The EEOC further instructs that courts should consider the following factors when determining whether an impairment substantially limits a major life activity:  "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."  29 C.F.R. § 1630.2(j)(2).

"Major life activities" are defined by another regulation as including "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).  The Appendix to that section elaborates on that definition in the following manner:

> This term adopts the definition of the term "major life activities" found in the regulations implementing section 504 of the Rehabilitation Act at 34 CFR part 104. "Major life activities" are those basic activities that the average person in the general population can perform with little or no difficulty.  Major life activities include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.  This list is not exhaustive.  For example, other major life activities include, but are not limited to, sitting, standing, lifting, reaching.

29 C.F.R. Part 1630, App. § 1630.2(i) (citations omitted).

When comparing a plaintiff's ability to perform "major life activities" with the abilities of an average person in the general population, there must be more than a mere difference in abilities. A plaintiff must show instead that her impairment causes "limitations that are in fact substantial." *Albertsons, Inc. v. Kirkingburg*, 527 U.S. 555, 565, 119 S. Ct. 2162, 2168, 144 L.Ed.2d 518 (1999).

Thus, the determination of whether an individual has a "disability" is not necessarily based on a diagnosis that a plaintiff suffers from a physical or mental "impairment"; rather, the decision is an individualized inquiry, focused on the effects that the impairment has on the plaintiff's life.

*See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482-83, 119 S. Ct. 2139, 2146-47, 144 L.Ed.2d 450 (1999); *Pritchard v. Southern Company Services*, 92 F.3d 1130, 1132 n.3 (11th Cir. 1996).  In that regard,

> [a] person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity.  To be sure, a person whose physical or mental impairment is corrected by the mitigating measures still has an impairment, but if the impairment is corrected it does not "substantially limit[]" a major life activity.

*Sutton*, 527 U.S. at 482-83, 119 S. Ct. at 2146-47.

Roberta Nickas contends that asthma substantially limits her ability to engage in the major life activities of breathing and working.  Defendant does not deny that breathing and working are major life activities, but argues that plaintiff's asthmatic condition does not — and, during the period at issue, did not — substantially limit either major life activity.[135]  This court agrees.

There is no question about the fact that asthma *may* substantially limit a person's ability to engage in major life activities and, thereby, constitute a "disability."  Several courts within this Circuit have so held.  *See, e.g., Adams v. Henderson*, 45 F. Supp. 2d 968, 975-76 (M.D. Fla. 1999); *Cantrell v. Delta Airlines, Inc.*, 2 F. Supp. 2d 1460, 1464 (N.D. Ga. 1998); *see also, e.g., Riebe v. E-Z Serve Convenience Stores, Inc.*, No. CA 00-0358-P-C, 2000 WL 1566516, at *3 (S.D. Ala. Sept. 29, 2000); *Lockett v. Wal-Mart Stores, Inc.*, No. CIV. A. 99-0247-CB-C, 2000 WL 284295, at *6 (S.D. Ala. March 8, 2000).

That, however, is not the issue.  Rather, this court must engage in an individualized inquiry, focused squarely upon the limitations that *plaintiff's* asthmatic condition imposed upon *her* ability to perform the major life activities of breathing and working.

---

[135] Defendant's Brief in Support of Summary Judgment at 19-20.

28

In that regard, the most compelling evidence supporting plaintiff's position is Dr. Toland's testimony that a female of plaintiff's age should have "peak flow" readings "around the 500 mark."[136]  A peak flow test is conducted with a device that measures the rate at which a patient can exhale.[137]  On March 31, 1998, plaintiff recorded peak flow measurements of 210 and 260, "which is well below her expected level."[138]  On April 2, 1998, she registered slightly higher peak flow measurements of 250 and 300.[139]  Her lowest marks occurred on July 2, 1998, when her peak flow measured only 180 and 200.  On that date, she was admitted to the hospital and placed on intravenous steroids and nebulizer treatments.  She remained hospitalized for five days.[140]  Dr. Toland recalled that, even after treatment with nebulized medication, plaintiff's peak flow measurements never exceeded 360.[141]  Plaintiff's medical records also demonstrate that she suffered from asthmatic bronchitis and bronchial infections several times during 1997 and 1998.

Even so, the most recent of those events was almost three months before plaintiff's September 24, 1998 admission to Huntsville Hospital.  She did not complaint of any symptoms characteristic of asthma on that (or any subsequent) date, nor did Dr. Ridner detect any.[142]  In fact, Dr. Ridner attributed her September 24 episode to possible gastrointestinal problems, rather than asthma.[143]  Further, when plaintiff was last examined by Dr. Toland on November 12, she did not

---

[136]Defendant's evidentiary submission, Tab 9 (Toland deposition), at 27.

[137]*Id.  See also* Dorland's Illustrated Medical Dictionary 640 (28th ed. 1994) (defining "flow" and "flow meter").

[138]*Id.*, Ex. 1 to Toland deposition (medical record for March 31, 1998).

[139]*Id.* (medical record for April 2, 1998).

[140]*Id.* (medical record for July 2, 1998).

[141]*Id.*, Tab 9 (Toland deposition), at 28.

[142]*See supra* text accompanying notes 74, 75.

[143]*See supra* text accompanying note 78.

complain of any asthmatic complications; indeed, she said "my asthma is doing all right now."[144] Even her request for a letter to defendant was couched in terms that did not convey great significance: "I have noticed that when I'm in the closed-in soldering room I have more problems with my asthma. It flares up more."[145]  On November 25, when plaintiff was examined by Dr. Johnson at the request of defendant, to determine her fitness to return to work, she did not make any statements or report any complaints regarding asthma, or difficulty breathing in her work environment, nor did she "request any occupational restrictions upon her employment related to an asthmatic condition adversely affected by any requirements of her employment with PEI."[146] Collectively, these facts indicate that the medications prescribed by Dr. Toland during July had corrected plaintiff's condition to the extent that it did not substantially limit her ability to perform the major life activities of breathing and working. In the opinion of this court, no reasonable fact-finder could conclude that plaintiff was "disabled" by asthma on November 30, 1998.

Even if this court should be wrong in that conclusion, plaintiff still has not established the second element of a prima facie case.

**B.    Second prima facie element:** *is the plaintiff "a qualified individual with a disability"*?

The term "a qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(m).[147]  To satisfy the second element of a prima facie ADA case, therefore, a

---

[144]*See supra* text accompanying note 86.

[145]*See supra* text accompanying note 88.

[146]*See supra* text accompanying note 92.

[147]29 C.F.R. § 1630.2(m) provides: "Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position

plaintiff must show

> either that he can perform the essential functions of his job without accommodation, or, failing that, show that he can perform the essential functions of his job with a reasonable accommodation. ... Thus, if [the plaintiff] is unable to perform an essential function of his ... job, even with an accommodation, he is, by definition, not a "qualified individual" and, therefore, not covered under the ADA. ... In other words, the ADA does not require [an employer] to eliminate an essential function of [the plaintiff's] job.

*Davis*, 205 F.3d at 1305 (citations omitted).[148]

This, plaintiff is unable to do.

### 1.   "Reasonable accommodations"

Discrimination under the ADA includes, among other things, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A); *see also* 29 C.F.R. § 1630.9(a).[149]

---

such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position. (See § 1630.3 for exceptions to this definition)."

[148]*See also Burch v. City of Nacogdoches*, 174 F.3d 615, 619 (5th Cir. 1999):

> To avoid summary judgment, Burch needed to show that (1) he could perform the essential functions of the job in spite of his disability, or (2) that a reasonable accommodation of his disability would have enabled him to perform the essential functions of the job.

[149]29 C.F.R. § 1630.9 provides:

> (a) It is unlawful for a covered entity not to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business.

> (b) It is unlawful for a covered entity to deny employment opportunities to an otherwise qualified job applicant or employee with a disability based on the need of such covered entity to make reasonable accommodation to such individual's physical or mental impairments.

> (c) A covered entity shall not be excused from the requirements of this part because of any failure to receive technical assistance authorized by section 506 of the ADA, including any failure in the

The Act defines "reasonable accommodations" as including the following adjustments:

> (A) making existing facilities used by employees readily accessible to and usable by persons with disabilities; and

> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training material or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9); *see also* 29 C.F.R. § 1630.2(*o*)(2).[150]

"An 'accommodation' is 'reasonable' — and, therefore, required under the ADA — only if it enables the employee to perform the *essential functions* of [the] job" she holds or seeks. *Willis*, 108 F.3d at 284 (emphasis supplied); *see also, e.g., LaChance*, 146 F.3d at 835.

### a.   "Essential functions" of an employment position

"Essential functions" are "the fundamental job duties of the employment position the [disabled employee] holds or desires." 29 C.F.R. § 1630.2(n)(1). The issue of "whether a particular job duty is an essential function involves a factual inquiry to be conducted on a case-by-case basis."

---

development or dissemination of any technical assistance manual authorized by that Act.

(d) A qualified individual with a disability is not required to accept an accommodation, aid, service, opportunity or benefit which such qualified individual chooses not to accept. However, if such individual rejects a reasonable accommodation, aid, service, opportunity or benefit that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered a qualified individual with a disability.

[150]29 C.F.R. § 1630.2(*o*)(2) provides that reasonable accommodations may include, but are not limited to the following:

(i)   Making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(ii)   Job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modification of equipment or devices; appropriate adjustment or modifications of examination, training material, or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities.

*Lucas*, 257 F.3d at 1258 (citing *Davis*, 205 F.3d at 1305).

Even so, the Act specifically provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(n);[151] *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000).

A district court is justified in adopting an employer's judgment of those job duties that are "essential functions" when the plaintiff does "not offer any evidence at the summary judgment stage to contradict that judgment." *Lucas*, 257 F.3d at 1259 n.6.

### b.  Who bears the burdens of identifying an "accommodation," and, establishing that it is "reasonable"?

In the Eleventh Circuit, it is the ADA plaintiff — not the employer — who bears the twin burdens of identifying an accommodation *and* establishing that the suggested accommodation is reasonable:  that is, it will allow the plaintiff to perform the essential functions of the position she holds or seeks.  *See Lucas*, 257 F.3d at 1255-56; *Reed*, 206 F.3d at 1062; *Stewart*, 117 F.3d at 1285;

---

[151] 29 C.F.R. § 1630.2(n) provides:

(1)  In general.  The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires.  The term "essential functions" does not include the marginal functions of the position.

(2)  A job function may be considered essential for any of several reasons, including but not limited to the following:

    (i)  The function may be essential because the reason the position exists is to perform that function;

    (ii)  The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

    (iii)  The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

*Willis*, 108 F.3d at 284.[152]

When a plaintiff fails to identify and suggest a specific accommodation, therefore, the employer's failure, either to investigate possible reasonable accommodations, or to engage in an "interactive process" with the plaintiff for the purpose of identifying possible accommodations, "is unimportant." *Willis*, 108 F.3d at 285; *Lucas*, 257 F.3d at 1256 n.2 (same); *accord Kennedy v. Dresser Rand Co.*, 193 F.3d 120, 122 (2d Cir. 1999) (summary judgment is appropriate where the plaintiff fails to identify a reasonable accommodation that the employer refused to provide). "No language in the ADA mandates a pretermination investigation," and, "the ADA provides no cause of action for 'failure to investigate' possible accommodations." *Willis*, 108 F.3d at 285 (citing *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 448 (11th Cir. 1996)).

"Once the plaintiff has met her burden of proving that reasonable accommodations exist, the defendant-employer may present evidence that the plaintiff's requested accommodation imposes an undue hardship on the employer." *Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir. 1998) (citing *Willis*, 108 F.3d at 286).

The ADA may require the employer to "restructure a particular job by altering or eliminating some of its marginal functions, [but] employers are not required to transform the position into another one by eliminating functions that are essential to the nature of the job as it exists." *Lucas*, 257 F.3d at 1260 (citing, *e.g.*, *Earl*, 207 F.3d at 1367; *Holbrook v. City of Alpharetta*, 112 F.3d 1522,

---

[152]*Willis* held, as a matter of first impression within the Eleventh Circuit, that "an ADA plaintiff (1) as part of her burden of production, must identify an accommodation that would allow her to perform her job duties and (2) as a part of her burden of proving her case, must establish that such an accommodation is reasonable." *Willis v. Conopco, Inc.*, 108 F.3d 282, 283 (11th Cir. 1997) (per curiam). In doing so, the court rejected the contention that the ADA "merely requires an employee to request accommodation — as an abstract concept — after which the employer becomes obligated to enter into a 'flexible, interactive process' involving both the employer and employee." *See also Lucas*, 257 F.3d at 1256 n.2.

1528 (11th Cir. 1997)).

The employer also may be required to "reassign" a disabled employee, but is not required "to bump another employee from a position in order to accommodate a disabled employee," or to promote a disabled employee. *Lucas*, 257 F.3d at 1256.

What makes this case especially difficult is that it appears PEI's accommodation of plaintiff could have been as easy as either requiring display room co-employees to allow her to use the bench vent and her personal fan, or by transferring her to any of the other areas of the plant in which her breathing had been more comfortable.

The terms of the letter that plaintiff requested Dr. Toland to write eliminated those possibilities, however.

Dr. Toland specified that plaintiff should be transferred to another position that did not entail the use of soldering irons, and, one that was free of "dust particles, pollens, etc."[153]

Moreover, plaintiff has not rebutted the testimony by members of defendant's Health and Safety Committee that there was no place within PEI's plant complying with such restrictions, much less a vacant position. Thus, plaintiff has failed to demonstrate that the accommodations she requested of PEI would have enabled her to perform the essential functions of a Tech III assembler. *See Lucas*, 257 F.3d at 1256-57 ("The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows [her] to perform the job's essential functions.").

Defendant's written description specifies that an assembler "uses ... soldering irons."[154] Because neither the ADA nor the Eleventh Circuit will require defendant to eliminate what is surely

---

[153] See *supra* text accompanying note 89.

[154] See *supra* text accompanying note 1 (job description).

an essential function of plaintiff's job, plaintiff has not met her burden "of identifying an accommodation, and of demonstrating that the accommodation allows [her] to perform the job's essential functions." *Lucas,* 257 F.3d at 1256-57 (citing *Stewart,* 117 F.3d at 1286).

The Eleventh Circuit addressed a similar issue in *Willis v. Conopco, Inc.* The plaintiff there was extremely sensitive to enzymes present at her job site, and requested her employer to accommodate her by reassigning her to a "safe work area," or enclosing her in an area that was air-conditioned. The plaintiff's physician provided her with a note, saying, "I think, she should stop working at this [] plant. There is nowhere within that building that she would be safe. ..." 108 F.3d at 283. After she was terminated, plaintiff claimed the defendant failed to accommodate her by transferring her to a different position, or making her work area safe for her. *Id.* The Eleventh Circuit held that she had failed to demonstrate that any alternative position existed that she could perform. *Id.* at 286. Likewise, in the present action, plaintiff has failed to demonstrate that any position existed that would have complied with Dr. Toland's restrictions. Accordingly, her disparate treatment and reasonable accommodation claims cannot survive summary judgment.[155]

This court is not inclined to engage in conjecture. It seems likely, however, that plaintiff could have met her burden of demonstrating a reasonable accommodation that would have permitted her to perform the essential functions of her job if she only had allowed Dr. Toland to clarify her letter of November 13, 1998. Both Dr. Toland and plaintiff have stated that the restrictions on

---

[155]Plaintiff argues that Wright's decision to fire her before he received the letter from Dr. Toland demonstrates that she could not be reasonably accommodated was pretext for unlawful disability discrimination. Actually, that is not the decision Wright had made. He had concluded that plaintiff should *either* be transferred *or* fired. (See *supra* text accompanying note 66 ("Nickas [should be] moved/fired")). But, even assuming the court reached the pretext issue, plaintiff's argument would merely prove that she was not discharged for being disabled. Rather, she appears to have been discharged for causing problems in the display room. The ADA protects plaintiff from being discharged for her disability under the pretext of a legitimate, nondiscriminatory reason, not the other way around.

plaintiff's working condition embodied in that letter were not intended to preclude plaintiff's complete exposure to all dust, particles, etc., so as to result in her termination by defendant. Although Dr. Toland offered to clarify those restrictions, plaintiff declined.

Plaintiff's refusal of Dr. Toland's offer not only served to eliminate all positions in which she could have performed the essential functions of her job, but it also flew in the face of the policy goals inherent in the EEOC's discrimination complaint procedures. Briefly, the EEOC is statutorily required to attempt to resolve complaints to that agency through a process of conciliation. *See, e.g.,* 29 C.F.R. §§ 1691.9; 42.609; *Equal Employment Opportunity Commission v. Klingler Electric Corp.*, 636 F.2d 104, 106 (5th Cir. 1981).[156] Complaint procedures were established so as to "allow the EEOC sufficient time to attempt informal conciliation between the parties." *Ray v. Nimmo*, 704 F.2d 1480, 1483 (11th Cir. 1983).

This burden of conciliation does not belong solely to the EEOC, however. Rather, there exists a "minimal responsibility on the part of the plaintiff in the resolution of his or her claims." *Zillyette v. Capital One Financial Corp.*, 179 F.3d 1337, 1340 (11th Cir. 1999). The Eleventh Circuit has reiterated that a "[p]laintiff should be required to assume some minimum responsibility himself for an orderly and expeditious resolution of his dispute." *Id.* (citing *Lewis v. Connors Steel Co.*, 673 F.2d 1240 (11th Cir. 1982)). That court has gone one step farther, in fact, and criticized a plaintiff's actions that interfered with the resolution of EEOC complaints. *See Zillyette*, 179 F.3d at 1340 (discussing the responsibility of plaintiff to work toward resolution of his claims, and faulting plaintiff for not informing EEOC of his address change, which led to his non-receipt of the

---

[156] Decisions of the former Fifth Circuit rendered prior to the close of business on October 1, 1981 constitute binding authority in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

right to sue letter).

Following the rationale of *Lewis* and *Zillyette*, then, when plaintiff deliberately prevented Dr. Toland from clarifying her restrictions — a clarification that likely would have enabled defendant to accommodate plaintiff — plaintiff unreasonably failed to fulfill her obligation, *de minimis* though it might be, of avoiding a situation in which defendant was left with no recourse other than termination of plaintiff's employment. *Cf. Faragher v. City of Boca Raton.* 524 U.S. 775, 807-08, 118 S. Ct. 2275, 2293, 141 L.Ed.2d 662 (1998) (discussing in context of Title VII sexual harassment claim an employee's "obligation of reasonable care to avoid harm"); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 2270, 141 L.Ed.2d 633 (1998) (same).

## C.   Retaliation

Subchapter IV of the ADA prohibits discrimination, coercion, threats, or interference directed at a person "because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceedings, or hearing under [the ADA]." 42 U.S.C. § 12203(a); *see also* 29 C.F.R. § 1630.12. That language creates a prohibition on retaliatory employment actions that is similar to Title VII's proscription.[157] Accordingly, the Eleventh Circuit assesses ADA retaliation claims under the same framework employed for Title VII retaliation claims. *See, e.g., Griffin v. GTE Florida, Inc.*, 182 F.3d 1279, 1281 (11th Cir. 1999); *Stewart*, 117 F.3d at 1287; *Taylor v. Renfro Corp.*, 84 F.Supp.2d 1248, 1254 (N.D.Ala. 2000).

To establish a prima facie case of retaliation under the ADA, plaintiff must show:  (1) that she engaged or participated in statutorily protected expression or activity; (2) that she subsequently

---

[157]See *supra* note 128.

suffered an adverse employment action; and (3) that there is a causal link between the protected expression or activity and the adverse action. *Lucas*, 257 F.3d at 1260-61; *Stewart,* 117 F.3d at 1287 (citing *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (explaining prima facie elements of Title VII retaliation claim)).  The burden-shifting framework here provides that:

> Once a *prima facie* case is established, the burden then shifts to the defendant employer to come forward with legitimate non-discriminatory reasons for its actions that negate the inference of retaliation.  *See Goldsmith*, 996 F.2d at 1163.  The plaintiff must then demonstrate that [she] will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation.

*Stewart*, 117 F.3d at 1287.

Plaintiff's retaliation claim also fails.  Plaintiff contends defendant retaliated against her by failing to require that other employees in the display room use vents, failing to transfer her out of the display room, and subjecting her to a hostile work environment.  Assuming that she has established a prima facie case, plaintiff has failed to demonstrate that defendant's reason for firing her is pretext for unlawful discrimination.  Defendant says that, under the restrictions imposed by Dr. Toland's letter, it had no positions plaintiff could occupy.  Plaintiff merely claims that defendant should have telephoned Dr. Toland to clarify the restrictions in her letter.  Yet, when Dr. Toland offered to write another letter, plaintiff refused.

Further, plaintiff's argument merely reiterates her reasonable accommodation claim, which this court has found without merit.  The Eleventh Circuit has twice rejected the attempts of plaintiffs to mask their reasonable accommodation claims in the "garb" of retaliation, *see Lucas*, 257 F.3d at 1261; *Stewart*, 117 F.3d at 1288, and this court sees no reason to do otherwise.

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is due to be granted.

An order consistent with this memorandum opinion shall be issued contemporaneously herewith.

DONE this _16th_ day of October, 2001.

_____
United States District Judge